**ORAL ARGUMENT NOT YET SCHEDULED**
Nos. 23-1031 (L), 23-1059

IN THE
# United States Court of Appeals for the District of Columbia Circuit

SIERRA CLUB,

*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

FLNG LIQUEFACTION 4, LLC; FREEPORT LNG DEVELOPMENT, L.P.,
*Intervenors for Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## RULE 30(c) PROOF BRIEF OF INTERVENORS FOR RESPONDENT

Lisa M. Tonery
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Robert M. Loeb
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC  20005
(202) 339-8400

Geoffrey C. Shaw
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071

*Counsel for Freeport LNG Development, L.P.
and FLNG Liquefaction 4, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

**Petitioner:**

Sierra Club

**Respondent:**

Federal Energy Regulatory Commission

**Intervenors and Parties in Interest:**

Freeport LNG Development, L.P.

FLNG Liquefaction 4, LLC

- Freeport LNG Development, L.P. is a Delaware limited partnership with its primary place of business in Houston, Texas.  It has one general partner, Freeport LNG-GP, LLC, a Delaware limited liability company wholly owned by MS-GP Holdco, LLC.

  Other than stated above, Freeport LNG Development, L.P. has no parent company.  Osaka Gas Co., Ltd, a publicly traded company on the Tokyo Stock Exchange, holds a 10.81% limited partnership interest in Freeport LNG Development, L.P. through its wholly-owned subsidiary,

Turbo LNG, LLC.  JERA Co., Inc. holds a 25.73% limited partnership interest in Freeport LNG Development, L.P., through a series of wholly-owned subsidiaries.  JERA Co., Inc. is a 50-50 joint venture between Tokyo Electric Power Company and Chubu Electric Power Co., Inc., each of which are publicly traded companies on the Tokyo Stock Exchange. No other publicly held corporations own 10% or more of Freeport LNG Development, L.P.

- FLNG Liquefaction 4, LLC is a Delaware limited liability company and wholly owned subsidiary of FLIQ4 Holdings, LLC ("FLIQ4 Holdco"). FLIQ4 Holdco is a Delaware limited liability company and is wholly owned by FLIQ4 Mezz Holdings, LLC, a Delaware limited liability company. FLIQ4 Mezz Holdings, LLC is wholly owned by FLNG Liquefaction Holdings, LLC, a Delaware limited liability company.  FLNG Liquefaction Holdings, LLC is wholly owned by Freeport LNG, LLC, a Delaware limited liability company.  Freeport LNG, LLC is wholly owned by Freeport LNG Development, L.P.

Other than stated above, FLNG Liquefaction 4, LLC has no parent company. No publicly held corporation owns 10% or more of FLNG Liquefaction 4, LLC, save the indirect ownerships noted above.

## B.    Rulings Under Review

Petitioner is seeking review of the Order Granting Extension of Time Request, 181 FERC ¶ 61,023, FERC Docket No. CP17-470-002 (Oct. 13, 2022). Petitioner additionally is seeking review of the Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 181 FERC ¶ 62,176, FERC Docket No. CP17-470-003 (Dec. 15, 2022).

Petitioner has filed a second Petition for Review that seeks to review the Order Addressing Arguments Raised on Rehearing, 182 FERC ¶ 61,112, FERC Docket No. CP17-470-003 (Feb. 23, 2023).

## C.    Related Cases

Counsel is unaware of any other related cases.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,  AND RELATED CASES ..........................................................................................i

    A.    Parties and Amici ...................................................i

    B.    Rulings Under Review ...................................................iii

    C.    Related Cases ...................................................iii

TABLE OF AUTHORITIES ...................................................vi

GLOSSARY OF ABBREVIATIONS .......................................ix

INTRODUCTION ..................................................................... 1

STATEMENT OF THE CASE .................................................. 4

    FERC Authorizes The Train 4 Project And FLNG Conducts A Yearlong Process To Engage An EPC Contractor........................ 4

    As The COVID-19 Pandemic Sweeps The World, FLNG's EPC Contractor Exits The Business And FLNG Obtains A Project Extension. ................................................................. 8

    FLNG Works To Engage A Replacement Contractor Despite Substantial Pandemic Obstacles. .................................................. 10

    FLNG Obtains A Second Extension And Sierra Club Petitions For Review. ............................................................... 13

STATUTES AND REGULATIONS ......................................... 20

SUMMARY OF ARGUMENT ................................................ 21

STANDARD OF REVIEW...................................................... 23

ARGUMENT ........................................................................... 24

    I.    There Is No "Unexplained Gap" In FLNG's Good Faith Work On The Train 4 Project.................................... 25

    II.    The Effects Of The COVID-19 Pandemic Amply Justified The Challenged Extension..................................... 32

A.    FERC reasonably concluded that the need to secure a replacement EPC contractor during the pandemic provided good cause for an extension. ........ 32

B.    FERC reasonably concluded that COVID-19's disruption of global energy markets provided good cause for an extension. ................................................ 37

III.    Petitioner's Requested Remedy Of Vacatur Is Wholly Improper. ....................................................................... 42

CONCLUSION ........................................................................ 44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ............................................................... 42

*BellSouth Corp. v. FCC,*
162 F.3d 1215 (D.C. Cir. 1999) ....................................................... 31, 41

*Black Oak Energy, LLC v. FERC,*
725 F.3d 230 (D.C. Cir. 2013) ............................................................ 42

* *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ...................................................................... 23, 41

*Confederated Tribes of the Chehalis Rsrv. v. Mnuchin,*
976 F.3d 15 (D.C. Cir. 2020) ........................................................... 8, 32

*Const. Pipeline Co.,*
165 FERC ¶ 61,081 (2018) ................................................ 15, 16, 21, 24

*Corpus Christi Liquefaction Stage III, LLC,*
179 FERC ¶ 61,087 (2022) .................................................... 19, 38, 40

*Dastagir v. Blinken,*
557 F. Supp. 3d 160 (D.D.C. 2021) .................................................. 33

* *Delfin LNG LLC,*
178 FERC ¶ 61,031 (2022) ................................................ 19, 37, 38, 40

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) .................................................................... 23

*Finberg v. U.S. Dep't of Agric.,*
6 F.4th 1332 (D.C. Cir. 2021) ........................................................... 23

* Authorities upon which Intervenors chiefly rely are marked with asterisks.

*Freeport LNG Dev., L.P.*,
  167 FERC ¶ 61,155 (2019)................................................................ 4, 5

*Freeport LNG Dev., L.P.*,
  181 FERC ¶ 61,023 (2022)........................18, 19, 31, 33, 37, 39, 40, 41

*LSP Transmission Holdings II, LLC v. FERC*,
  45 F.4th 979 (D.C. Cir. 2022)........................................................ 24

*Magnolia LNG, LLC*, Docket Nos. CP14-347-000, CP19-19-
  000, and CP14-511-000 (Oct. 7, 2020) ........................................ 38

*Midship Pipeline Co.*,
  173 FERC ¶ 61,255 (2020) ............................................................ 38

*In re NTE Conn., LLC*,
  26 F.4th 980 (D.C. Cir. 2022).................................................. 8, 9, 33

* *Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ............................................ 23, 31, 41

*Shaffer v. George Washington Univ.*,
  27 F.4th 754 (D.C. Cir. 2022)......................................................... 8

*Transmission Agency of N. Cal. v. FERC*,
  495 F.3d 663 (D.C. Cir. 2007) ..................................................... 23

*Trunkline Gas Co.*,
  179 FERC ¶ 61,086 (2022)................................................... 19, 38, 40

* *Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
  6 F.4th 1321 (D.C. Cir. 2021)................................................. 42, 44

## Statutes

5 U.S.C. 706(2)(A)........................................................................ 23

5 U.S.C. 706(2)(E)........................................................................ 23

**Other Authorities**

*KBR Plans to Exit LNG Business & Focus on Government Unit*, Zacks Equity Research (June 23, 2020), https://www.nasdaq.com/articles/kbr-plans-to-exit-lng-business-focus-on-government-unit-2020-06-23 ................................... 9

*Letter Order to LA Storage, LLC*, Docket No. CP08-454-000 (issued Nov. 14, 2013) ........................................................................ 39

S. Ct. COVID-19 Guidance (Mar. 19, 2020), https://www.supremecourt.gov/orders/courtorders/031920z r_d1o3.pdf ........................................................................................... 2

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Answer | *Freeport LNG*, Answer in Opposition to Motion to Intervene and Protest of Sierra Club (June 22, 2022), JA __-__ |
| EPC | Engineering, procurement, and construction |
| FEED | Front-end engineering and design |
| FERC | Federal Energy Regulatory Commission |
| First Extension Order | *Freeport LNG*, Order Granting Extension of Time Request (Sept. 10, 2020), JA __-__ |
| First Extension Request | *Freeport LNG*, Request for Three Year Extension of Time to Construct Train 4 (July 27, 2020), JA __-__ |
| FLNG | Freeport LNG, Inc. |
| LNG | Liquid natural gas |
| Protest | *Freeport LNG*, Motion to Intervene and Protest of Sierra Club (June 7, 2022), JA __-__ |
| Rehearing Answer | *Freeport LNG*, Answer in Opposition to Rehearing Request (Nov. 29, 2022), JA __-__ |
| Rehearing Order | *Freeport LNG*, Order Addressing Arguments Raised on Rehearing (Feb. 23, 2023), JA __-__ |
| Second Extension Order | *Freeport LNG*, Order Granting Extension of Time Request, 181 FERC ¶ 61,023 (Oct. 13, 2022), JA __-__ |
| Second Extension Request | *Freeport LNG*, Request for 26-Month Extension of Time to Construct Train 4 (May 16, 2022), JA __-__ |

ix

**INTRODUCTION**

Freeport LNG, Inc. ("FLNG") is the developer of facilities in Brazoria County, Texas for the liquefaction and export of domestically produced natural gas.  In 2019, FLNG received approval from the Federal Energy Regulatory Commission ("FERC" or "the Commission") to develop a natural gas liquefaction unit (referred to as a "train") and associated infrastructure at its existing liquid natural gas ("LNG") terminal.  After receiving FERC approval, FLNG immediately began work on developing the project, made significant financial investments in furtherance of the project, and engaged an engineering, procurement, and construction ("EPC") contractor to engineer and construct the liquefaction train and associated infrastructure.

Just months later, however, the COVID-19 pandemic brought the nation to a standstill and threw labor markets, material supply chains, and global energy markets into disarray.  Shortly thereafter, the principal EPC contractor FLNG hired to engineer and construct the project unexpectedly exited from the LNG business and withdrew from its engagement with FLNG.  This was a significant setback:  FLNG had

finalized its agreement with this EPC contractor after a year of vetting and negotiation.

To hear Sierra Club tell it, FLNG then sat on its hands and did nothing for nearly two years. Nothing could be further from the truth. After the EPC contractor's unexpected exit, FLNG immediately began the arduous process of securing a replacement EPC contractor, even though the pandemic's shutdowns were at their heights, and proceeded as expeditiously as possible given the pandemic's constraints.

FLNG received two modest extensions of time for completion of the project from FERC, the second of which Sierra Club challenges here. As Americans adjusted to the realities of the pandemic, COVID-19-related extensions for complex projects were commonplace in myriad contexts, and all levels of government sought to be adaptive and flexible to our shared unprecedented circumstances. Even the Supreme Court extended its cert petition deadline to the statutory maximum by standing order. *See* S. Ct. COVID-19 Guidance (Mar. 19, 2020), https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf. Relevant here, FERC granted "good cause" extensions for energy infrastructure projects in case after case, recognizing that the pandemic

threw countless obstacles at the planning, construction, and commercialization of such projects. *See Infra* 37-39 (citing cases).

The extension at issue here was amply justified and consistent with the norm for projects of this kind during the pandemic. Applying its well-established good cause standard, FERC determined the extension was warranted because FLNG had worked diligently to secure a replacement contractor, yet faced unforeseen obstacles from the strains COVID-19 imposed on nearly every aspect of the economy. Sierra Club's principal quibble with FERC's analysis is that the Commission "ignored" a claimed "two year gap" in which FLNG supposedly did nothing to seek a replacement after its original contractor withdrew. That argument rests on a fundamental misunderstanding of the contracting process for sophisticated LNG projects of this nature. FERC knows that in such a process the dates of the final bids—focused on by the Sierra Club—represent one of the last steps in a long, detailed vetting process. In reality, FLNG was actively and diligently vetting potential replacement EPC contractors that whole time. Given FERC's background knowledge of how the process

works, there was nothing arbitrary about FERC's conclusion that FLNG has pursued the project in good faith throughout.

This Petition, at its core, is not about COVID-19 or extensions of time, but reflects Sierra Club's ongoing, indiscriminate "fight to slow and stop the construction of new oil and fracked gas export terminals and related infrastructure." OB Add10 (Hinojosa Decl. ¶ 2). Lacking all merit, the Petition should be denied.

## STATEMENT OF THE CASE

### *FERC Authorizes The Train 4 Project And FLNG Conducts A Yearlong Process To Engage An EPC Contractor.*

On May 17, 2019, FERC granted authorization under Section 3 of the Natural Gas Act, authorizing FLNG to site, construct, and operate a fourth natural gas liquefaction train and pretreatment unit, and associated infrastructure ("Train 4 Project" or "Project") at Freeport's existing Quintana Island LNG terminal, and at its existing pretreatment facility site, respectively. *Freeport LNG Dev., L.P.*, 167 FERC ¶ 61,155 (2019). FLNG has already completed construction of, and placed into service, liquefaction Trains 1-3 and associated facilities at the Quintana Island terminal and at the pretreatment facility site.

4

In approving the Train 4 project, the Commission concluded that "the siting, construction and operation of the Train 4 Project will not result in significant impacts on the human environment and that the project can be constructed and operated safely." *Id.* at 61,959. The authorization provided for an initial in-service deadline of May 17, 2023. Neither Sierra Club nor any other entity petitioned for review of FERC's approval of the Project.

Meanwhile, FLNG actively worked to secure an engineering, procurement, and construction contractor for the Project. As FERC is well aware, an EPC contractor is a critical entity in the development of LNG infrastructure, responsible for all aspects of planning, engineering, and construction. Because of the scope, complexity, and technical sophistication of LNG infrastructure development, there are only a handful of contractors in the country with the capability to fulfil an EPC contract for a Project like FLNG Train 4.

The process of engaging an EPC contractor capable of performing an LNG project is long and complicated. Before potential contractors are allowed to submit formal bids, these potential contractors and the project sponsor engage in multiple stages of in-depth investigation and

assessment to determine whether the potential contractors have the capabilities to build the project to the required performance specifications and the capacity to take on the risk inherent in guaranteeing that the facility will be operational by the in-service deadline. The multi-stage process includes:

- *Initial Vetting.* Project sponsors send a draft EPC contract to potential contractors many months, even years, before a formal RFP issues, to lay out the parameters of the project and initiate discussion and analysis. Contractors interested in pursuing the project typically first conduct a "fatal flaw analysis," where they evaluate whether any categorical obstacles preclude their engagement. They also perform an initial assessment of risks.

- *Front-End Engineering and Design Vetting.* The next necessary step is for the project sponsor and the remaining potential EPC contractors to execute a front-end engineering and design (FEED) agreement. The FEED agreement sets out the terms under which potential contractors will develop detailed design and engineering plans for the project (or, if

plans already exist, exhaustively vet them) and perform further investigations to verify that they have the capacity to meet project specifications and necessary performance criteria. Potential contractors are typically paid substantial sums for their FEED work—work which can take months, and sometimes more than a year.

- *Final Review of Bids Under a Reimbursement Contract.* Only after these layers of initial review are completed does the stage begin when potential contractors that qualify prepare and submit firm bids. Potential bidders who wish to continue pursuing the project after completing and satisfying the fatal flaw and FEED verification processes sign bid reimbursement agreements, under which they are paid to perform their final inspections and analysis and prepare formal bids. The project sponsor then deliberates on the firm bids received and finalizes an agreement.

Here, after an exhaustive contracting process taking more than a year, FLNG identified KBR, Inc. ("KBR") as the preferred EPC contractor for the Train 4 Project in May 2020. *See Freeport LNG,*

Request for Three Year Extension of Time to Construct Train 4 at 1
(July 27, 2020), JA __; *Freeport LNG*, Request for 26-Month Extension
of Time to Construct Train 4 at 2 (May 16, 2022), JA __.

### As The COVID-19 Pandemic Sweeps The World, FLNG's EPC Contractor Exits The Business And FLNG Obtains A Project Extension.

In March 2020, the rapid spread of COVID-19 brought the world
to a standstill and shut down the national economy.  The pandemic
"disrupted the daily lives of nearly all Americans," *Shaffer v. George
Washington Univ.*, 27 F.4th 754, 759 (D.C. Cir. 2022), and "invade[d]
nearly every facet of life," *Confederated Tribes of the Chehalis Rsrv. v.
Mnuchin*, 976 F.3d 15, 29 (D.C. Cir. 2020) (Henderson, J., concurring).
Critically for FLNG, the pandemic immediately caused major
"[d]isruptions to supply chains and labor markets," which provoked
rapidly "shifting costs" for construction and raised significant
"obstacles" to the development of major energy infrastructure projects.
*In re NTE Conn., LLC*, 26 F.4th 980, 984 (D.C. Cir. 2022).  The
pandemic not only made the development of major infrastructure
projects dramatically more complex by disrupting supply chains and the
availability of qualified personnel; it also seismically altered global

market conditions, with implications for investment and commercialization of LNG projects as investors and potential customers faced unprecedented uncertainty as to future demand. *See id*.

In June 2020, KBR—the EPC contractor FLNG worked for almost a full year to engage—surprisingly exited the LNG business altogether and pulled out of its EPC agreement with FLNG. *See KBR Plans to Exit LNG Business & Focus on Government Unit*, Zacks Equity Research (June 23, 2020), https://www.nasdaq.com/articles/kbr-plans-to-exit-lng-business-focus-on-government-unit-2020-06-23. KBR's unexpected exit was a major setback for the Train 4 project; FLNG faced the daunting task of re-doing the complex EPC contractor vetting and engagement process in the midst of the global pandemic crippling the economy.

On July 26, 2020, FLNG requested an extension of time from the Commission. *Freeport LNG*, Request for Three Year Extension of Time to Construct Train 4 (July 27, 2020), JA __-__. FLNG explained that because KBR had withdrawn, FLNG "must rebid the EPC contract prior to commencing construction of the Train 4 Project." *Id*. at 2, JA __. By then, bids previously received for the Project were out of date and in

any event did not reflect the drastically different economic environment of 2020 compared with pre-pandemic times.  FLNG also noted that "the current world-wide economic climate and depressed global LNG prices resulting from the coronavirus pandemic, make it challenging to complete long-term contracts with potential customers, resulting in associated delays for LNG projects in the United States and around the world."  *Id.* at 1-2, JA __-__.

On September 10, 2020, the Commission granted FLNG an extension of time and set a new in-service deadline of May 17, 2026. *Freeport LNG*, Order Granting Extension of Time Request (Sept. 10, 2020), JA __-__.  Neither Sierra Club nor any other entity challenged or petitioned for review of this extension.

### FLNG Works To Engage A Replacement Contractor Despite Substantial Pandemic Obstacles.

Promptly after KBR's exit, FLNG began the multi-step process of engaging a new EPC contractor.  As complex as the process of engaging an EPC contractor is in normal times, it was even more so during the first year of the pandemic.  As explained above (at 6-7), the contracting process involves extensive review by potential contractors in which they assess whether they have the technical capability to deliver on the

10

contract and the ability to assume the risks involved in guaranteeing completion by the in-service deadline. COVID-19 made each of these assessments even more difficult. As supply chains collapsed, contractors could not rely on previous assumptions about the feasibility and cost of sourcing construction materials. Contractors were left to guess whether state and federal regulations would permit workers to be present on site at key stages of construction and whether existing work plans would be possible given pandemic precautions. And chaos in the global markets sent labor force and engineering cost projections into uncharted territory. Thus, potential contractors needed to perform novel and deliberate assessments to determine whether they could undertake the project and how to structure their bids.

Despite those extraordinary circumstances, FLNG moved forward diligently with the process of seeking a new EPC contractor for the Project. On August 17, 2020, less than a month after filing its extension request, FLNG began discussions about the Project with two potential replacement contractors and requested review and comment on an initial draft EPC agreement. Both contractors promptly responded, and within weeks, FLNG and the contractors had exchanged

redlines and comments on the draft EPC agreement and notes on next steps. In October 2020, FLNG conducted meetings with both contractors as they performed their fatal flaw analyses.

Because neither contractor had vetted or bid for the Project during the selection of the initial EPC contractor, they needed to begin their review from scratch. Early in 2021, FLNG executed FEED Verification Agreements with both contractors, under which each contractor would be paid substantial sums to perform their review and analysis of the project to determine if they could meet the technical requirements of the project on the required timeline. FLNG executed a contract for $2 million with one candidate on January 15, 2021. And it executed a $2.5 million contract with another on February 26, 2021.

At the conclusion of the FEED verification process, FLNG continued its discussions with both contractors in anticipation of soliciting formal bids. Meanwhile, in November 2021, a third potential replacement contractor notified FLNG of its intent to participate in the bidding process. This contractor was able to fast-track some of the initial stages of vetting because it had participated in the design and construction of FLNG's other liquefaction trains.

The formal bidding stage began in March 2022.  At that time, FLNG circulated initial drafts of a bid reimbursement agreement for each contractors' review.  Thereafter, bid reimbursement agreements with the bidders were executed in May 2022, with bids due on October 31, 2022.  A bid evaluation process was conducted for several months after receiving the bids.  Ultimately, a bid from Kiewit was selected, and the parties engaged in final negotiations on the basis of that bid. On May 9, 2023, FLNG signed an EPC agreement with Kiewit. Consistent with that agreement, Kiewit is now fully engaged as the EPC contractor for the Train 4 project.

### FLNG Obtains A Second Extension And Sierra Club Petitions For Review.

On May 16, 2022, having a line-of-sight into the timing of its receipt of firm bids for the Train 4 Project from qualified EPC bidders, FLNG applied for a second extension, requesting 26 additional months for project completion.  *Freeport LNG*, Request for 26-Month Extension of Time to Construct Train 4 (May 16, 2022) ("Second Extension Request"), JA __-__.  FLNG explained that it "has attempted in good faith to meet the in-service deadline, obtaining and maintaining all required permits and expending approximately $100 million in capital

to progress the development of the Train 4 Project." *Id*. at 2, JA __.  But it needed more time "due in large part to delays stemming from the COVID-19 pandemic." *Id*. at 1, JA __.  FLNG explained that "due to KBR's decision to exit the LNG EPC business," it had "been required to conduct another lengthy bidding process for the EPC contract prior to commencing construction of the Train 4 Project." *Id*. at 2-3, JA __.

FLNG also explained that the pandemic "made it extremely difficult to secure long-term LNG commercial commitments given the far-reaching economic effects of the pandemic, and the uncertainty of future demand." *Id*. at 1, JA __.  Finally, FLNG underscored that "[n]o changes to the Project are proposed in connection with the requested extension of time," and that "the request is only to change the timing, not the nature, of the project and the environmental and other public interest findings for the Train 4 Project remain valid." *Id*. at 3, JA __.  Thus, "the requested extension will not undermine the Commission's prior findings that the Train 4 Project is not inconsistent with the public interest." *Id*., JA __.

On June 7, 2022, Sierra Club filed a motion to intervene and protest to FLNG's extension request.  *Freeport LNG*, Motion to

14

Intervene and Protest of Sierra Club (June 7, 2022) ("Protest"), JA __-__. Sierra Club admitted that "KBR's exit might have constituted good cause for some delay if Freeport had acted 'diligently' to replace KBR." *Id*. at 5, JA __ (quoting *Const. Pipeline Co.*, 165 FERC ¶ 61,081, P 10, P 25 (2018)). But Sierra Club asserted that "Freeport did not even 'initiate[]' the process of replacing KBR until at least two years after learning of this difficulty," *id*., JA __—apparently believing that the process of engaging a replacement contractor began in May 2022, when potential contractors commenced a formal bidding process, even though this occurred near the end of the complex vetting and verification process initiated in August 2020.

Sierra Club also contested that "the COVID-19 pandemic made it extremely difficult to secure long-term LNG commercial commitments given the far-reaching economic effects of the pandemic, and the uncertainty of future demand." *Id*. at 6, JA __. And Sierra Club suggested that the Commission should permit the re-litigation of the findings of the original order authorizing the Train 4 Project, complete with additional environmental review under the National Environmental Policy Act. *Id*. at 7-12, JA __-__.

15

FLNG filed an answer in opposition to Sierra Club's Protest on
June 22, 2022. *Freeport LNG*, Answer in Opposition to Motion to
Intervene and Protest of Sierra Club (June 22, 2022) ("Answer"). FLNG
reiterated that the Commission liberally grants extensions and applies
a flexible "good cause" standard, under which "'[g]ood cause' for an
extension of time 'can be shown by a project sponsor demonstrating that
it made good faith efforts to meet its deadline but encountered
unforeseeable circumstances.'" *Id*. at 3-4, JA __-__ (quoting *Const.
Pipeline Co.*, 165 FERC ¶ 61,081, P 9).

FLNG made clear that it easily demonstrated good faith in
pursuing the Project despite the significant obstacles posed by COVID-
19. FLNG explained that "at the time the original extension of time
was granted, it was not expected that the pandemic would persist for as
long as it has, or that the resulting effects on global markets, including
global LNG markets, the global supply-chain and the financing of large-
scale infrastructure, would be so significant." *Id*. at 2, JA __. And since
the first extension, "FLNG's diligent efforts to meet its in-service
deadline include actively marketing the Train 4 Project capacity,
obtaining and maintaining all required permits, expending

approximately $100 million in capital to progress development, and conducting a second competitive bidding process for an [EPC] contract— all during an unprecedented, once-in-a-generation global pandemic that significantly impacted every sector of the domestic and global economies." *Id*. at 4-5, JA __-__.

FLNG explained that Sierra Club's suggestion that it had not begun the process of seeking a replacement contractor until May 2022 "reflects a patent misunderstanding of the protracted, multi-million dollar procurement process that is required to replace an EPC contractor." *Id*. at 6, JA __. What "Sierra Club fails to recognize [is] that the bidding and selection process is a significant undertaking requiring many months of careful preparation." *Id*. at 6-7, JA __-__. It requires the project sponsor to "identify[] and select[] qualified, competent bidders, [which] typically takes several months of technical evaluations." *Id*. at 7, JA __. "[T]he competitive bidding process itself requires approximately six months in order to develop the necessary cost and schedule information for the bidders to submit a fixed price and schedule proposal." *Id*., JA __. Then, "after bids are received, several months are usually needed to negotiate the final commercial

17

terms to execute the contract." *Id.*, JA __. And this already long process was made all the more complicated because, when KBR pulled out, "the country was facing severe impacts from the spread of COVID-19, economic upheaval, and strict safety-related lockdowns." *Id.*, JA __.

On October 13, 2022, FERC granted the extension request and set August 1, 2028 as the in-service deadline. Order Granting Extension of Time Request, *Freeport LNG Dev., L.P.*, 181 FERC ¶ 61,023 (Oct. 13, 2022) ("Second Extension Order"). The Commission concluded that FLNG had been more than diligent in pursuing the Project despite pandemic obstacles. In particular, "during the time since it received its authorization, Freeport LNG has, among other things, maintained its permits for the project, actively pursued commercial agreements, and is actively pursuing a new engineering, procurement, and construction contractor (after the unanticipated withdrawal of its previous contractor), all of which we find evidence continued commitment to proceeding with the project." *Id.* at P 12. The Commission rejected "Sierra Club's assertion that Freeport LNG's failure, to date, to have replaced its engineering, procurement, and construction contractor and commence construction of its project is evidence that Freeport LNG has

not taken 'all reasonable, good-faith efforts to meet its deadlines'" and concluded that "the unforeseeable difficulties associated with the COVID pandemic," and the associated "major disruptions due to global lock-downs and logistical hurdles" provided good cause for the extension. *Id.*

The Commission cited multiple previous instances in which it "found good cause exists for an extension of time where an authorization holder requested more time to secure contracts with potential customers, in particular where the COVID pandemic causes market disruptions." *Id.* at P 11 (citing *Trunkline Gas Co.*, 179 FERC ¶ 61,086, P 21 (2022); *Corpus Christi Liquefaction Stage III, LLC*, 179 FERC ¶ 61,087, P 13 (2022); *Delfin LNG LLC*, 178 FERC ¶ 61,031, PP 21-23 (2022)). The Commission also granted Sierra Club's motion to intervene. *Id.* at P 4.

On November 14, 2022, Sierra Club filed a request for rehearing. *Freeport LNG*, Rehearing Request of Sierra Club (Nov. 14, 2022), JA __-__. The rehearing request was automatically denied by operation of law on December 15, 2022. *Freeport LNG*, Denial of Rehearing by Operation of Law (Dec. 15, 2022), JA __-__. On February 23, 2023,

FERC issued an order explaining the denial of rehearing, again stating that "despite the difficulties outside of its control, Freeport LNG had continued to make good faith efforts to meet the deadline in its authorization, including maintaining permits for the project, actively pursuing commercial agreements, and actively pursuing a new engineering, procurement and construction contractor." *Freeport LNG*, Order Addressing Arguments Raised on Rehearing at P 4 (Feb. 23, 2023) ("Rehearing Order"), JA __. The Commission explained that it had "appropriately relied upon Freeport's explanation regarding the unanticipated withdrawal of its contractor, the lengthy bidding process for engaging a new contractor, and the impact of global pandemic conditions." *Id.* at P 7. The Commission also reiterated that the underlying project authorization and environmental analysis remain valid—a conclusion not challenged in this Court. *Id.* at PP 8-15.

Sierra Club then petitioned to this Court for review.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the addendum to the Commission's brief.

## SUMMARY OF ARGUMENT

FERC regularly grants extensions for "good cause."  Good cause "can be shown by a project sponsor demonstrating that it made good faith efforts to meet its deadline but encountered unforeseeable circumstances" beyond its control.  *Const. Pipeline Co.*, 169 FERC ¶ 61,102 (2019).  Here, the Commission properly determined that good cause supported the grant of an extension where FLNG demonstrated consistent good faith in pursuing the project, while facing delays from the need to replace its EPC contractor and challenges posed by the COVID-19 pandemic.

**I.** Sierra Club's primary argument is that the Commission overlooked a purported "two-year gap" between the time FLNG's original EPC contractor exited the market and the time FLNG began selecting a replacement.  There was no such gap.  The false assumption of such a gap is based on a lack of understanding of the essential basic process of engaging an EPC contractor for a major, sophisticated project like Train 4—an understanding that FERC possesses, and which informs Commission's baseline approach to extension requests in this context.  In reality, FLNG began the process of engaging a replacement

promptly after its original contractor unexpectedly exited the LNG business. And it pressed forward with the multi-step contracting process as expeditiously as possible given COVID-19's disruptions.

**II.** Sierra Club's argument that FERC failed to sufficiently explain why COVID-19 justified an extension here is equally meritless. *First*, FERC reasonably concluded that the need to secure a replacement EPC contractor provided good cause for a second extension because the pandemic imposed unprecedented complications on the already complex EPC contracting process. *Second*, FERC reasonably found that COVID-19's impact on global markets and demand for LNG provided good cause for an extension, as it has done in numerous similar pandemic-era cases. Sierra Club faults the Commission for not delving into exacting detail about the specific ways the pandemic interfered with FLNG's work on the Project, but the Commission's Order straightforwardly accounts for its reasoning and easily satisfies the Administrative Procedure Act's reasonable explanation requirement.

**III.** Vacatur is wholly unjustified. To the extent the Court perceives any inadequacy in the Commission's explanation of its decision, that deficiency can easily be remedied on remand while the

existing extension order and present in-service deadline remain in force. And vacating the extension order would be extremely disruptive because it would send the Project back to square one and imperil more than $100 million already invested.

## STANDARD OF REVIEW

This Court sets aside a Commission order only if it is "arbitrary [and] capricious" or "unsupported by substantial evidence."  5 U.S.C. 706(2)(A), (E); *see also Finberg v. U.S. Dep't of Agric.*, 6 F.4th 1332, 1336 (D.C. Cir. 2021); *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 671 (D.C. Cir. 2007).  "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency.  A court simply ensures that the agency has acted within a zone of reasonableness" and "reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  This requirement is not "particularly demanding."  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  Reviewing courts must "uphold a decision of less than ideal clarity" so long as "the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight*

*Sys., Inc.*, 419 U.S. 281, 286 (1974). And where, as here, the challenged order turns on the Commission's "judgment involving regulatory policy at the core of its mission" and concerns the "interpretation of the parameters set by its own orders," review is especially "entitled to substantial deference." *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 999-1000 (D.C. Cir. 2022).

## ARGUMENT

All agree that FERC may for "good cause" grant extensions on approved projects and that "'good cause' can be shown by a project sponsor demonstrating that it made good faith efforts to meet its deadline but encountered unforeseeable circumstances" beyond its control. OB 6-7; FERC Br. 5, 16-17; *Const. Pipeline Co.*, 169 FERC ¶ 61,102. Petitioner contends that FERC acted arbitrarily in concluding that the "good faith" requirement was satisfied, because it did not account for an "unexplained gap" during which FLNG purportedly failed to begin the process of engaging a replacement EPC contractor for nearly two years after the unexpected withdrawal of its original EPC contractor. OB 19-23. And Petitioner claims that FERC acted arbitrarily in concluding that the "unforeseeable circumstances"

24

requirement was satisfied, because it concluded that delays associated with Covid-19 justified an extension but supposedly did not account for how the pandemic delayed FLNG's progress on the Project.  OB 24-28.  Both contentions are meritless.

## I.  There Is No "Unexplained Gap" In FLNG's Good Faith Work On The Train 4 Project.

Petitioner's primary argument that the Commission "ignored" an "entirely-unexplained two-year delay between the time when Freeport's first contractor announced it was exiting the LNG business, in June 2020, and the time when Freeport 'initiated' the process of soliciting bids for a replacement, in May 2022," OB 19, rests on a fundamental misunderstanding of the EPC contracting process.  *See* FERC Br. 22-24, 26.

FERC, from its expertise and experience, understands how the LNG EPC contractor selection process works and the substantial time and resource demands of the process, and FERC uses that knowledge in assessing extension requests.  FERC is well aware that before potential contractors are allowed to submit formal bids, there is a lengthy vetting process to determine whether a potential bidder has the technical capabilities necessary to build the project to the required performance

25

standards and the capacity to take on the risk inherent in guaranteeing that the LNG facility will be operational by the in-service deadline. *See* FERC Br. 22-24. As detailed above (at 6-7), the process starts with the project sponsor sending a draft contract to potential contractors, detailing the parameters of the project. Contractors potentially interested then typically engage in a "fatal flaw analysis," where they evaluate whether any categorical obstacles preclude their engagement and perform an initial assessment of risks.

After the initial process, the project sponsor and the remaining potential EPC contractors execute a FEED agreement, which allows for detailed technical evaluation and/or additional design work necessary to fully vet the project. This allows the potential contractors to perform further investigations to verify that they have the capacity to meet project specifications and necessary performance criteria. Potential contractors are typically paid substantial sums for the vetting work they perform under the FEED agreement—work which can take months, and sometimes more than a year.

After the thorough vetting in the FEED process, the few remaining potential contractors that qualify submit actual bids. The

bidders sign bid reimbursement agreements, under which they are paid to perform their final inspections and analysis and prepare formal proposals. Then, after review and analysis of bids and the final inspection reports, the project sponsor selects a contractor and finalizes the EPC agreement.

Sierra Club, not understanding that lengthy, multi-step process, says FLNG did not even "initiate[] the process of soliciting bids for a replacement" until *two years* after KBR surprisingly exited from the LNG market, leaving FLNG with no EPC contractor. OB 19. Apparently, Sierra Club believes that the process of engaging a replacement contractor began in May 2022, when potential contractors initiated their final bid process. But under the process described above, the initiation of the final bid process came toward the end of a complex undertaking beginning much earlier. May 2022 was near the end of the lengthy EPC contractor vetting process—not its "initiat[ion]."

FLNG began the process of securing a replacement contractor *in 2020*, promptly after KBR's exit. As detailed above (at 11-12), FLNG opened discussions with potential replacement contractors and circulated draft EPC contracts in August 2020. The contractors

27

performed their initial review and fatal flaw analyses that Fall. In November 2020, FLNG began negotiating several FEED verification agreements with potential bidders. In early 2021, FLNG contracted to pay the potential replacement contractors $4.5 million to prepare front end engineering and design reports, which were delivered in May and September 2021. In November 2021, FLNG began talks with an additional interested replacement contractor. Unlike the other interested contractors, this contractor performed a fast-tracked initial vetting process because it had been involved in the design and construction of FLNG's initial three-train project. FLNG issued initial bid reimbursement agreements and ultimately paid interested bidders $7.4 million to prepare their full bids. Then, after months of vetting and design review by its potential contractors, FLNG opened the process of received firm bids for the project in May 2022. *See supra* 13.

This late date is when Petitioner claims FLNG "initiated the process of soliciting bids." OB 19. But as just explained, this milestone represents the 90-yard-line of the EPC contacting process. Thus, Sierra Club's assertions that FLNG went "nearly two years without even trying to find a contractor" (OB 4), "failed to begin its process to secure

a replacement EPC contractor until May 2022" (OB 12), and "fail[ed] to even attempt to secure a replacement contractor until May 2022" (OB 24) reflects a critical lack of understanding of EPC contracting for this type of major, sophisticated LNG project.

FLNG in fact diligently sought a replacement contractor promptly after KBR pulled out and pressed forward with the complex EPC engagement process at significant expense, despite the obstacles of the pandemic. Petitioner's assertions that FLNG acted in a manner that "do[es] not bespeak diligence or any sense of urgency at all" (OB 28), and "set its certificate on a shelf and let it lie dormant" (OB 29) are wholly unjustified. Contrary to Sierra Club's misrepresentation, there was simply no "prolonged … period of inactivity." OB 20.

This reality was clear to FERC from its expertise, knowledge, and experience with LNG projects. When FLNG stated in its extension request that it had "initiated [the] competitive bidding process … in order to receive firm price and schedule proposals" in May 2022 (Second Extension Request at 3, JA __), FERC understood that this represented the final stage in an ongoing process. *See* FERC Br. 22-24, 26. If there was any doubt, FLNG spelled this point out expressly in its Answer to

Sierra Club's Protest.  FLNG stated directly that "Sierra Club's assertion that FLNG did not move rapidly enough to replace its EPC contractor … reflects a patent misunderstanding of the protracted, multi-million dollar procurement process that is required to replace an EPC contractor.  Sierra Club fails to recognize that the bidding and selection process is a significant undertaking requiring many months of careful preparation."  Answer at 6-7, JA __-__.  FLNG clarified that "[i]dentifying and selecting qualified, competent bidders for the project typically takes several months of technical evaluations;" that "[o]nce a short list of qualified bidders is created, the competitive bidding process itself requires approximately six months in order to develop the necessary cost and schedule information for the bidders to submit a fixed price and schedule proposal for the construction of the project;" and that "[a]fter bids are received, several months are usually needed to negotiate the final commercial terms to execute the contract."  Answer at 6-7, JA __-__.

There is no merit to the contention that the period Sierra Club focuses on was "unexplained" or "ignored" by the Commission.  OB 18. Far from overlooking the issue, the Commission stated that it

30

"appropriately relied upon Freeport's explanation regarding the

unanticipated withdrawal of its contractor" and "the lengthy bidding

process for engaging a new contractor" in granting the extension.

Rehearing Order at P 7, JA __.  This explanation was more than

sufficient.  *See* FERC Br. 34.  FERC's obligation to detail its reasoning

is not "particularly demanding." *Public Citizen*, 988 F.2d at 197.  "It

suffices … that [the court] can discern the why and the wherefore."

*BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999).  Here, it

is abundantly clear that the Commission understood FLNG to have

diligently pursued a replacement contractor since the original

contractor's exit from the market.

Thus, there was therefore nothing arbitrary about FERC's

conclusion that FLNG's "actively pursuing a new engineering,

procurement, and construction contractor (after the unanticipated

withdrawal of its previous contractor)" demonstrated FLNG's "good

faith effort at meeting the deadline in its [existing] authorization" and

"evidence[d] continued commitment to proceeding with the project."

Second Extension Order at P 12, JA __-__.  This conclusion simply

accorded with the reality that FLNG proceeded as expeditiously as

31

practicable in selecting a new EPC contractor despite the obstacles

posed by COVID-19.

## II.    The Effects Of The COVID-19 Pandemic Amply Justified The Challenged Extension.

Petitioner also argues that FERC failed to adequately explain why

COVID-19 justified the challenged extension.  This contention is equally

meritless.  The nature of the COVID-19 pandemic and the ensuing

economic consequences are well known.  And here they imposed

multiple obstacles for FLNG in meeting its prior in-service deadline.

The Commission properly concluded that these unforeseen obstacles

easily justified the modest extension at issue here.

### A.    FERC reasonably concluded that the need to secure a replacement EPC contractor during the pandemic provided good cause for an extension.

As this Court has recognized, the COVID-19 pandemic caused

unprecedented uncertainty that hung over "every facet of life."

*Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 29

(D.C. Cir. 2020) (Henderson, J., concurring).  The pandemic posed

unique challenges for the development of large scale energy

infrastructure projects because it caused "shifting costs" and intense

"[d]isruptions to supply chains and labor markets." *In re NTE Conn., LLC*, 26 F.4th 980, 984 (D.C. Cir. 2022).

FERC reasonably found that the need to engage a replacement contractor at the height of the pandemic and the ensuing economic upheaval imposed severe obstacles on FLNG and provided good cause for an extension here. *See* FERC Br. 20-21. FERC properly noted that "the challenges of replacing an engineering, procurement, and construction contractor," which are significant "in normal times," were even more pronounced given "the logistical hurdles posed by the uncertainty of the then-nascent COVID-19 pandemic." Second Extension Order at P 10, JA __. And the Commission concluded that in granting the second extension, it "appropriately relied upon Freeport's explanation regarding the unanticipated withdrawal of its contractor, the lengthy bidding process for engaging a new contractor, and the impact of global pandemic conditions." Rehearing Order at P 7, JA __. "Issues like a pandemic … are justifications for delay that the Court is ill-equipped to second guess." *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 166-67 (D.D.C. 2021).

33

Petitioner's unexplained assertion that "there is no reason to think that COVID-19 impacted Freeport's ability to secure a replacement contractor" (OB 18) is simply false. The pandemic compounded the difficulty of the already-complex EPC contracting process because supply chain and labor disruptions, work restrictions, and market uncertainty required potential contractors to fundamentally reassess their technical capabilities and risk tolerance as they deliberated on their ability to construct a major infrastructure project and assume an EPC contract with exacting technical requirements and a guaranteed in-service deadline.

As explained above (at 6-7), EPC contractors take on substantial risk when they are engaged for a project on the scale of Train 4: They must be able to complete the project on time and at budget. When there are supply chain blockages, major market fluctuations, and uncertainty regarding the availability of materials and labor and the safety of working conditions, potential contractors' risk calculus is substantially more complex. Accordingly, the pre-bid diligence and analysis that is an essential part of the EPC contracting process becomes all the more arduous. *See* FERC Br. 30.

34

Petitioner also claims that FLNG "offer[ed] no explanation whatsoever as to why selection of a replacement contractor did not proceed on the schedule" FLNG originally anticipated and "set out in 2020." OB 20. But this is simply not true. FLNG explained that "at the time of KBR's decision [to withdraw], the country was facing severe impacts from the spread of COVID-19, economic upheaval, and strict safety-related lockdowns," which inevitably slowed the process of selecting a replacement. Answer at 7, JA __. While "the bidding and selection process is a significant undertaking requiring many months of careful preparation" in normal times, it was even more challenging and drawn out during the pandemic. *Id.* at 6-7, JA __-__. FLNG thus explained that it had "proceeded as expeditiously as practicable in selecting a new EPC contractor," "given the circumstances." *Id.* at 7, JA __. In any event, as the Commission explains, "the pandemic's adverse effects on workforces, supply chains, and commercial markets were so readily apparent that little explanation is even needed to understand how these forces" caused delay. FERC Br. 34.

Further, in its answer to Sierra Club's rehearing request, FLNG explained that it "experienced significant delays associated with

replacement of its [EPC] contractor" because "the complicated, lengthy process to replace the EPC contractor was made more difficult due to the widespread effects of the pandemic on the economy, workforce, and supply chain." *Freeport LNG*, Answer in Opposition to Rehearing Request at 2, 6 (Nov. 29, 2022) ("Rehearing Answer"), JA __, __. And FLNG made clear that "at the time the original extension of time was granted, it was not expected that the pandemic would persist for as long as it has, or that the resulting effects on global markets, including global LNG markets, the global supply-chain and the financing of large-scale infrastructure, would be so significant." Rehearing Answer at 2, JA __. Although FERC did not consider this submission in denying rehearing (Rehearing Order at 3, JA __), it underscores that Petitioners' suggestion that FLNG provided "no explanation whatsoever" about the pandemic's impact on the replacement process is simply false.

Petitioner also points out that "several other LNG facilities signed contracts with EPC contractors in 2021 and early 2022, demonstrating that the pandemic did not make it categorically impossible to seek, negotiate, and secure such a contract, or at least make progress in doing so." OB 27. This is irrelevant. FLNG does not dispute that it was

36

possible to "seek" and "negotiate" an EPC contract during the pandemic, because it acted diligently to do exactly that throughout the period Sierra Club trumpets as "unexplained."  In any event, "categorical impossibility" is not the applicable good cause standard.  What matters is that the pandemic raised obstacles to FLNG's ability to meet the previous deadline, which it unquestionably did.  *See* FERC Br. 28-30.

## B.    FERC reasonably concluded that COVID-19's disruption of global energy markets provided good cause for an extension.

FERC also reasonably concluded that an extension was justified because COVID-19 provoked unprecedented uncertainty in the global market for LNG, which interfered with FLNG's ability to secure customer contracts and commercialize the Train 4 Project.  Second Extension Order at PP 9-11, JA __-__.

There was nothing novel about this determination.  It is well established that good cause exists for an extension when a project sponsor who has otherwise been diligent needs "more time to secure contracts with potential customers."  *Delfin LNG LLC*, 178 FERC ¶ 61,031, PP 21-23 & n.61 (2022).  The Commission has repeatedly invoked this principle in multiple other cases to grant extensions when

project sponsors request more time to commercialize an otherwise viable project due to pandemic disruptions. *See* FERC Br. 17-18, 27-28; *Delfin LNG LLC*, 178 FERC ¶ 61,031, PP 21-23 & n. 61 (granting an extension of time to construct the onshore portions of a non-jurisdictional LNG export terminal in light of the applicant's continued efforts to negotiate and secure long-term contracts with prospective customers but requiring that the project remain commercially viable); *Corpus Christi Liquefaction Stage III, LLC*, 179 FERC ¶ 61,087 (2022) (finding good cause for a 31-month extension of time where companies cited unforeseeable impacts of the COVID-19 pandemic as reason for an extension); *Trunkline Gas Co.*, 179 FERC ¶ 61,086 (2022) (granting where companies faced difficulties due to the COVID-19 pandemic yet demonstrated a continued commitment to the project).

FERC has held as much again and again. *See Midship Pipeline Co.*, 173 FERC ¶ 61,255, 62,712 (2020) (granting extension because certificate holder "has been unable to fully commercialize its project," in part because of COVID-19); *Magnolia LNG, LLC*, Docket Nos. CP14-347-000, CP19-19-000, and CP14-511-000 (Oct. 7, 2020) (granting extension because global market conditions impacted project sponsor's

ability to secure contracts); *Letter Order to LA Storage, LLC*, Docket No. CP08-454-000 (issued Nov. 14, 2013) (granting a certificate holder a second extension of time due to changing market conditions and difficulty in finding customers).

FERC appropriately applied its precedent here and concluded that changes in global market conditions also contributed to FLNG's good cause for an extension. Second Extension Order at P 12, JA __. Petitioner cannot dispute that changing market conditions can provide good cause by necessitating more time to secure customer contracts when a project sponsor has otherwise acted in good faith. Nor does Petitioner contest that "the COVID-19 pandemic's impact on demand" in fact "made it difficult to secure long-term LNG commitments." *Id*. at P 9, JA __-__. Petitioner asserts only that FERC did not adequately explain why the Commission's established precedent justified an extension here. *See* OB 27-28. But FERC more than accounted for it reasoning. *See* FERC Br. 32-33.

- The Commission summarized FLNG's request for an extension on the ground that "the COVID-19 pandemic has created persistent effects on global supply chains and the financing of large-scale

infrastructure projects" and that "the COVID-19 pandemic's impact on demand made it difficult to secure long-term LNG commitments." Second Extension Order at P 9, JA __-__.

- The Commission cited and quoted multiple precedents in which "[t]he Commission has previously found good cause exists for an extension of time where an authorization holder requested more time to secure contracts with potential customers, in particular where the COVID pandemic causes market disruptions." *Id.* at P 11, JA __-__ (citing *Corpus Christi*, 179 FERC ¶ 61,087; *Trunkline*, 179 FERC ¶ 61,086; and *Delfin*, 178 FERC ¶ 61,031, PP 21-23 & n.61).

- The Commission reiterated that FLNG is "not sitting on its approval while waiting to see whether market conditions become favorable" but "has, among other things, maintained its permits for the project, actively pursued commercial agreements, and is actively pursuing a new engineering, procurement, and construction contractor." *Id.* at P 12, JA __-__.

- And the Commission concluded that "[t]he unforeseeable difficulties associated with the COVID pandemic" thus provided good cause.  *Id.*, JA __.

Petitioner claims that the Commission should have gone into more detail to justify this conclusion.  OB 27.  But the Commission was "not required to author an essay" to explain its decision.  *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999) (citation omitted).  FERC's obligation to explain its decision is not "particularly demanding."  *Public Citizen*, 988 F.2d at 197.  And even if a decision displays "less than ideal clarity," it will be upheld as long as the agency's "path" can be "reasonably … discerned."  *Bowman*, 419 U.S. at 286.

Here, the path is readily apparent, as the Commission noted FLNG's unrebutted explanation that "the COVID-19 pandemic's impact on demand made it difficult to secure long-term LNG commitments," Second Extension Order at P 9, JA __, cited three previous orders establishing that "good cause exists… where [a certificate] holder requested more time to secure contracts," *id.* at P 11, JA __, and listed FLNG's other steps "evidence[ing] continued commitment to proceeding with the project," *id.* at P 12, JA __.  In short, the Commission engaged

41

in precisely the kind of reasoned, non-arbitrary decision-making that the Administrative Procedure Act requires.

### III.   Petitioner's Requested Remedy Of Vacatur Is Wholly Improper.

"The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  Both factors conclusively foreclose vacatur here.  *See* FERC Br. 36-37.

First, it is more than "reasonably likely that on remand the Commission can redress" any perceived "failure of explanation" "while reaching the same result."  *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021).  If the Court perceives any inadequacy in the Commission's explanation, the Commission could easily supplement its order to provide a more detailed accounting of FLNG's pursuit of a replacement contractor and the effects of COVID-19 on project commercialization.  Petitioner's contrary claim that the Commission "is unlikely to be able to

42

substantiate its decision on remand" is based entirely on the false assertion that FLNG did not "make a good faith effort to satisfy its construction deadline." OB 29. If this Court were to remand, the Commission would simply provide a more detailed explanation of FLNG's diligent efforts to engage a replacement contractor and reach the same result.

Importantly, Petitioner does not challenge on appeal any of the Commission's underlying environmental conclusions or its conclusion that the Project is not inconsistent with the public interest. Thus, the only task for the Commission on remand would be to add additional detail supplementing its good cause analysis. The Commission could easily do so while the existing extension order remained in place.

Second, vacatur would be exceedingly disruptive. As FLNG explained to the Commission, it has already invested approximately $100 million in the Project, and has obtained and maintained all required permits, conducted two competitive bidding processes for EPC contractors, and actively marketed the Project's capacity. Answer at 4, JA __. Vacating the extension order would undermine these significant investments and "needlessly disrupt completion of the project[]."

43

*Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1332.

Thus, if this Court perceives any error in FERC's order, it should at most remand without vacatur.

## CONCLUSION

The petition should be denied.

September 5, 2023                    Respectfully submitted,

                                     */s/ Robert M. Loeb*

Lisa M. Tonery                       Robert M. Loeb
ORRICK, HERRINGTON &                 ORRICK, HERRINGTON &
  SUTCLIFFE LLP                        SUTCLIFFE LLP
51 West 52nd Street                  1152 15th Street NW
New York, NY  10019                  Washington, DC  20005
                                     (202) 339-8400

                                     Geoffrey C. Shaw
                                     ORRICK, HERRINGTON &
                                       SUTCLIFFE LLP
                                     355 S. Grand Avenue, Suite 2700
                                     Los Angeles, CA  90071

*Counsel for Freeport LNG Development, L.P.*
*and FLNG Liquefaction 4, LLC*

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Cir. R. 32(e)(2) because this brief contains 8,024 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for*
*Freeport LNG Development, L.P. and*
*FLNG Liquefaction 4, LLC*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on September 5, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for*
*Freeport LNG Development, L.P. and*
*FLNG Liquefaction 4, LLC*